Vandenberg versus RQM et al. We are here for oral argument on this case via Zoom conference. As you can see, Justice Gordon and I are here, and Justice Cunningham is the third member of our panel. She is participating orally but not through her camera, but she is present and will be asking questions. Welcome, and thank you to all of you for being willing to participate with us in this manner. Just to briefly go over how we intend to do things today, we are going to give each party 10 uninterrupted minutes, followed by questions after that party has argued from the panel. We'll begin with Justice Gordon, then Justice Cunningham, and then me, if we have any questions. If the appellants would like to reserve any part of their 10 minutes for rebuttal, they may do so, and probably not have any questions, but if any member of the panel has a burning question after the rebuttal, I will give them an opportunity to ask that question. Just for the record, could the appellants' counsel please state their name for the record? Thank you, Justice Mikva. My name is Edward Feldman. I represent the Appellant Mactabula Law Group, PC, and my partners, Diane Clotney and Mary Eileen Wells, are invisible participants on the Zoom screen. Okay, thank you. Counsel for the appellee. Oh, I'm sorry. Mr. Feldman, did you want to reserve any part of your 10 minutes? Yes, I'd like to reserve two minutes, please. Okay. Counsel for the appellee. Yes. Thank you, Your Honor. Thank you, Justice Mikva, and Justice Gordon, and Justice Cunningham for giving us this opportunity. It's Joseph A. Power, Jr. for Scott and Patty Vandenberg, and myself and Mr. John Growvick and our respective law firms. We have people here as well sitting on the sidelines, if you will. Are both of you intending to argue, or are you intending to be the sole person arguing? I will be the sole person arguing, Your Honor. All right. And I am going to try to hold everybody pretty strictly to your time. Do not feel that you need to use the entire 10 minutes, but you're free to. All right. Mr. Feldman, whenever you're ready, you may begin. Thank you, and may it please the court. This appeal addresses whether the trial court improperly imposed a fee forfeiture, basically a $10 million sanction, against the trial lawyers who handled the case for five years and settled the case for $25 million after a three and a half week jury trial, and instead allowed the lawyers who handled the post trial and appellate proceedings that upheld the settlement, let them lay claim to the entire contingent fee. The clients, Scott and Patty Vandenberg, hired McNabola Law Group, MLG, in 2010 to recover for Scott's catastrophic injury. MLG did that. MLG recovered $2.365 million in 2012 from the RQM settlement and negotiated the additional $25 million settlement with Brunswick on June 9, 2015. Brunswick's last pretrial offer was $3 million. By the end of closing argument, Brunswick had increased that offer by more than a factor of eight to $25 million due to the sweat of the MLG trial team. MLG accepted that offer, and this court, in the first appeal, upheld the settlement. The value that MLG created in this case is incontrovertible. The Vandenbergs have been paid. MLG has not. It was paid a portion of the fee from the first settlement. It deferred $300,000 from that first settlement. It has been paid zero from the second settlement, and its expenses have not been reimbursed at all from the second settlement. The Vandenbergs have received the benefits of both settlements, which total over $31.4 million, and they've received about $21.5 million in money and lien payments. So this is between the lawyers. Now this court, in the first appeal, held that the $25 million settlement that MLG negotiated was binding and enforceable on June 9, 2015, when the offer was accepted. That is the law of the case. That's the law of this case. And the post-trial lawyers didn't appear on the scene for another nine months. Now in ordering that MLG's $9.8 million contingent fee should be forfeited, the trial court adopted the post-trial lawyer's version of disputed facts without any live testimony, and it ruled that MLG should get nothing, essentially a $9.8 million sanction for all of the work it did and the benefits it achieved for the Vandenberg. Not even the uncontested expenses it laid out of pocket did the trial court award. That ruling is reversible error. Now there's been a blizzard of paper and lots of outrageous accusations and attempts to assassinate the characters of not only Mark McNavola, but Barry Montgomery. But the legal analysis in this case is really fairly simple. There's two broad issues, quantum meruit and forfeiture. The first issue, quantum meruit, does McNavola Law Group meet the standards under the Rhodes Supreme Court opinion and its progeny for a quantum meruit award of one-third of the settlement recovery? Put another way, did MLG earn the fee for handling the case for five years, trying it for three and a half weeks, and settling the case for $25 million? Under the law, and on this record, it clearly has earned that fee, minus the quantum meruit contribution of the post-trial lawyers for handling the post-trial and the appellate work. If you read all the cases that are cited in the briefs, you won't find a stronger quantum meruit case than this one. Issue two, forfeiture, have the post-trial lawyers met the demanding standards set forth in Restatement Section 37 that would warrant the forfeiture of the fee that McNavola Law Group earned ultimately into their pockets for doing the post-trial and the appellate work. Put simply, was Mark McNavola's conduct so egregious and so terrible that it inflicts such harm to the clients that five years of effort and three and a half weeks of jury trial and the outlay of over a million dollars of expenses should be wiped out, should be just flushed down the train, and the fee earned from those efforts should effectively be passed over to the post-trial lawyers for doing the post-trial and the appellate work? The answer is no. There's no reported case that involves granting or condoning such a windfall of an earned contingent fee into successor counsel's pockets. No reported case involved the successor counsel trying to grab a full one-third contingent fee simply for handling post-trial proceedings and an appeal. We ask that this court not be the first one to issue such a ruling. Let me put the parties' respective positions in a different way. One side, McNavola Law Group, MLG, has consistently said that the court should divide the full fee between the two sets of lawyers, with each set getting their quantum error contribution to the recovery. The other side, the post-trial lawyers, argue, in effect, let us claim 100% of the fee, everything, and give absolutely nothing to the trial counsel who handled the case for five years, attended a combined over 100 depositions and court appearances, prepared for two months to try the case, tried it for three and a half weeks, and negotiated the $25 million settlement that this court found binding. A few more comments on the quantum error issue. It has been nearly 10 years since the Vandenbergs first retained McNavola Law Group in September 2010. During the first half of that decade, MLG assumed the risks of time and treasure on a case that was risky. And it was risky. The plaintiff was intoxicated when he fell on the boat. MLG devoted thousands of hours of uncompensated time that led to the binding settlement. As I mentioned, 54 depositions, 53 court appearances. The post-trial lawyers didn't do that. MLG retained and paid for six testifying experts and six treating physicians. Post-trial lawyers didn't do that. MLG deployed four attorneys and two paralegals for two months to prepare for and try the case for over three and a half weeks. Post-trial lawyers didn't do that. And MLG negotiated the $25 million settlement. Post-trial lawyers didn't do that either. And MLG assumed the risk, all the risk of the time, of the discovery, the experts, and the trial. The post-trial lawyers walked into the case after the trial, after the settlement, which was, although Judge Lynch had committed error, there was a binding settlement agreement. The evidentiary hearing that Barry Montgomery tried had already been held. And Barry Montgomery had developed the two arguments that prevailed in the first appeal. Argument one, that Mark McNavola owed a duty to his client, but not to Brunswick, and therefore had no duty to say anything about the conversation he had had with AG. Barry Montgomery developed that winning argument in this appeal. And amazingly, the post-trial lawyers in the first appeal did not make that argument to this court. And Barry Montgomery made the argument that Justice Mikva adopted in her concurrence. And that is the argument that by the time everybody got in chambers, everybody knew what the note said. Everybody wanted to do the settlement before the note existed, and everybody wanted to do the settlement when they knew what the note said. So what's all the fuss about? Barry Montgomery made that argument as well. McNavola Law Group also invested treasure, over a million dollars, in outlay, and from which it is waiving any right to recover over $900,000 of the monies it has laid out. And now another five uncompensated years have passed since June of 2015. The clients have justly received— About a minute to finish up. Thank you. So as I said, there's never been a stronger quantum error case than this one. And let me just spend a minute on the forfeiture issue. I just want to talk about two things that the trial court found on forfeiture that are insupportable, along with the other insupportable rulings it made. First, in paragraph five, the trial court found that Mark had induced, quote-unquote, induced Agee to tell him the content of the trial note. Not even the post-trial lawyers argued that to Judge O'Hara. Not a shred of evidence supports it. It never happened. It never happened. And the post-trial lawyers themselves, when they were arguing back in 2016 to Judge O'Hara, they told Judge O'Hara that Agee volunteered the question to Mark, and the extern, Brooke Reynolds, testified that she overheard the conversation and that Agee told her that Agee had volunteered the content of the question to Mark because she likes to help the plaintiffs. So there's nothing in the record to support—absolutely nothing in the record to support that finding. And then last thing I'll say on forfeiture, and then I'm happy to answer whatever questions the court has. In paragraph 10, Judge O'Hara finds that somehow Mark McNabola violated rule 1.4E in connection with engaging Barry Montgomery to represent them. There is no rule 1.4E. It doesn't exist. We have no idea what Judge O'Hara was referring to, and the engagement of Barry Montgomery was absolutely the right thing to do in this case. And he developed the record and made the arguments that ultimately prevailed in this case. And I thank you for your time, and I'm happy to answer any questions. Justice Gordon, do you have any questions for Mr. Feldman? Yes, I do. You talked about, Mr. Feldman, you talked about the, you know, the conduct of the plaintiff trial lawyer and its effect on the client. Is that really the test? Is the test its effect on the client, or is it the effect on the legal community and the public as a large? Under section 37 of the Restatement of the Law Governing Lawyers, which is, we're asking this court, it's never been addressed in Illinois, although other jurisdictions have adopted it. There's a list of factors to consider on whether a lawyer who's earned a fee should forfeit that fee in whole or in part. And one of those factors is whether the client was benefited or hurt by the lawyer's conduct. So it is relevant to look at the benefit that the lawyer bestowed to the client or, on the contrary, if the lawyer caused any harm to the client. Here on both sides of that equation, McNabola Law Group bestowed extraordinary benefit on the client and no ultimate harm on any of the issues. And the other thing Restatement section 37 talks about in the comments is the principle of proportionality, that if you're going to, we don't think there should be any sanction or any forfeiture whatsoever, but if there was ever going to be a forfeiture, it must be proportionate to the alleged offense. And here, what's essentially a $10 million forfeiture would be, there should be none, but it would be grossly disproportionate to what is alleged here. Well, how about the harm to the profession as a whole? That's a matter for the ARDC to consider. And that's something that is set forth both in this court's first opinion in the Lustig versus Horne case, that the Supreme Court has the primary jurisdiction over discipline of lawyers and considering the harm to the public or the harm to the judicial system and that's the appropriate venue to address those issues. As you know, that proceeding is going ahead and we believe will prevail there, but that's where the appropriate venue for addressing those issues. All right. So you're telling me that we should write that we should disregard its effect on the legal community as a whole and on the public as a whole. Is that what you're telling me? No, I'm not telling you you should disregard it. What I'm suggesting is that that is not under the applicable standard, a basis for whether a fee should be forfeited, a fee that was earned from all of the effort in this case. And that's a matter ultimately for the ARDC and the Supreme Court to consider, but not an issue for a fee forfeiture. Justice Cunningham, I'm sorry, Justice Gordon, did you have any other questions? No. Justice Cunningham? Yes, I do have questions. Can you hear me? I can. I can't see you, but I can hear you. Okay. Well, that's good enough for me. You know, our Supreme Court, Mr. Feldman, our Supreme Court has said that when there's a contingency fee contract in a case and the contingency and the contract ceases to exist, then the attorney's right to a contingent fee also terminates. So how do you get around that if you're arguing that you're entitled to a specific portion of the settlement based on the original contract? I'm not actually getting around it. I'm following, I'm asking the court to follow the law in cases such as the Rhodes case, the Wagner case, the Will v. Northwestern case, the De La Paz case, all the cases we cite in the brief, which say, first of all, yes, if the client discharges the lawyer, then the contract goes away. But where the lawyer has done the lion's share of the work and either comes close to a settlement or actually achieves a settlement, then the appropriate quantum merit remedy is the one third contractual fee minus if there's any quantum merit of successor counsel, then that gets subtracted. So the same law that says the contract disappears says that the quantum merit award can still be in the contract amount if the lawyer has achieved, basically procured the result. And that's exactly what happened here is set forth in our briefs. I'm glad you mentioned quantum merit because that was my next question. Isn't that really your only real path to recovery under the facts of this case? Yes. I mean, quantum merit is the path to recovery and the case law supports it squarely. So in order to recover under that theory, wouldn't you have to give the trial court some data on which to make a determination? How would the court determine what is a fair amount of money? Did you give the court any data, any records of hourly work or anything like that on which the court could make a determination? And if not, why not? We gave the court the data that the case law suggests is the appropriate data. No, Mr. Feldman, I'm asking a more narrow question. Did you give the court any data related to the work that these particular lawyers had done on this case as related to what they were asking for in terms of quantum merit? So it's not, I'm not talking about case law. I'm talking about specific data related to the work of these lawyers on this case. And the answer to that question, Justice Cunningham, is yes. The data was not in the form of hours, but the data was in the form of affidavits talking about the 54 depositions attended and the 50 plus court appearances and the three and a half week jury trial and all the work that went into a five and a half year old case. And under the case law, starting with Rhodes, that is the determinant. You don't have to put in your hours. Where a settlement is achieved due to the efforts of the trial counsel, they're entitled to the full contract amount minus the quantum merit amount. So there's no need to put in hours. And the court can consider the record. The court can take judicial notice as well as the affidavits that were submitted. All of the work that went into trying a case and achieving a $25 million settlement after closing arguments in the case. Well, you know, I can, I assume that that all or nothing argument was something that was a strategic decision, but well, okay. Thanks. I just, I guess I would respectfully disagree on it being a matter of strategy. We believe that the law that we cited prescribes exactly that approach. And we were following the law as we understood it to be. Ironically, the post-trial lawyers, we invited them for their quantum merit to submit hours to calculate what the deduction from the quantum merit award should be to the law group. And they declined to do that. They made a tactical decision to roll the dice and claim the full 100%. Mr. Feldman, what I'm suggesting is it certainly would change the conversation somewhat. And I can't see what it would have hurt for you to put that data before the court as well. It certainly, in my opinion, would have strengthened your argument that the judge committed error by completely disregarding that as opposed to expecting him to sift through case law and other supportive documentation that you are saying supported the quantum merit theory that you were advancing. Anyway, thank you. Those are all my questions, Justice McBeth. Thank you, Justice Cunningham. Thank you, Justice Cunningham. Mr. Feldman, sort of going in the opposite direction of Justice Cunningham. While usually you're absolutely right, the contract ends when the lawyer is discharged. In this case, the contract, which the firm drafted, had a specific provision as to what was going to happen if the lawyer got discharged. Correct? It did. It did have that. And why doesn't that provision control here? Well, I think we end up in the same place. First of all, I think under the law, that provision falls with the contract. And we're back in quantum merit land. But in any event, even if you apply that... Slow down. Why does that provision fall with the contract? I'm sorry. I didn't see a case that you cited or either side cited that said that provision disappears when the contract disappears. My understanding, and perhaps I'm not reading the cases correctly, but my understanding of cases is when the client discharges the lawyer, the compensation terms of the contract fall with the discharge. And then the lawyer must apply under quantum merit principles for the fee that is earned. So I believe that if you apply that, that that provision falls with the contract. But even if it doesn't, even if that provision applies, we end up in the same place because the provision says that the lawyer gets either. I've read the provision counsel and it says that if there is an offer on the table at the time of discharge, you're entitled to a percentage of it. And there was no offer on the table. I understand that the offer that had been on the table was later reinstated, but it was not on the table at the moment of discharge, correct? Uh, I would say it was, I would say that is actually not correct. What was on the table at that point was a binding and enforceable settlement. Now, Judge Lynch had vacated that settlement erroneously, but this court ultimately held and it's the law of the case that the settlement was binding and enforceable as of June 9th, 2015. So that was, that was a given. And even the post-trial lawyers, when they came into the case, they did a hedge appropriately. They did a hedge. They made the argument, first of all, that the contract was enforceable, the original contract, but they also took the position that the offer was still on the table. And in fact, they sent a letter to Brunswick, to AIG, the adjuster, saying your offer is still on the table and we accept. And that's all, that's all in the record. Okay. Assume with me for a second that, that that offer wasn't on the table, then you were required, were you not, if I'm right, if, if, if it wasn't on the table to present dollars times hours or to give evidence of your hours and you did not do that. Do you agree that you've thereby forfeited any right to compensation based on your hours in the case? Um, no, I don't believe we forfeited, uh, forfeited that. I think the alternative of that clause that we were entitled to one third, uh, would still, uh, would still apply. If this court thinks that we should submit hours, uh, I suppose it could remand for that purpose, but we don't think that that's what the law provides or that that's appropriate in this case. Uh, we, we believe on this record, given, uh, the court's first ruling, uh, and the enforceable settlement as, uh, uh, at the time of discharge, uh, and that's what this court ultimately held. And, uh, under the case law, uh, McNamara law group, which procured that settlement and invested five years and over a million dollars of time to achieve it is entitled to a quantum merit award of one third of the ultimate recovery minus the quantum merit of the post-traumatic stress disorder. All right. I have two last quick questions. The RQM remaining dollars, those would come not from the new lawyers, but would come from the clients. Is that right? Um, yes, the RQM remaining dollars are about $111,000, uh, from, from that settlement. And yes, that would come, uh, the, uh, the, the new lawyers, I believe are withholding enough money and, uh, uh, to cover that. I'm confused. So that would come from the new lawyers or from money that they're holding slightly more than the, uh, uh, than the van, than the Brunswick settlement. Gotcha. And how about the costs? Those were the, would be the risk. Those would be from the lawyers as well, or from the, well, that's from, they're holding to cover the approximately $169,000 in, uh, in expenses, uh, post RQM expenses, uh, that were incurred, uh, uh, in the case. And they've, they've held back enough from the, uh, payments that Vandenberg's have been paid 19 million out of the, um, uh, Brunswick settlement. I believe that the lawyers are holding about 10.4 million, which is more than enough. I guess what I'm saying is as to those two pots of money, smaller pots of money, the dispute is actually between the, the law, between your, the MLG law firm and the Vandenberg's, correct? That small piece of the RQM, the RQM tail is, uh, involving the Vandenberg's, the expenses there, there's really no genuine dispute on the, uh, uh, the expenses with the exception of a $300 item that we decided was not worth fighting in the library. $600. But yes, I'm sorry. Okay. That's all. Those are all my questions. Thank you. Um, Mr. Powers. May it please the court. Uh, thank you again for hearing us on this particular case on behalf of our clients and my co-counsel. All right. First we'll address the standard of review briefly. Uh, if you look at, uh, two cases cited by the, uh, appellant deal, a pause and Wagner, both of them went without evidentiary hearings. They were, uh, again, Clown Marrow with cases of my legal services. They both were on an abusive discretion standard of review. So these were two cases discussed below. They cited Wagner, uh, in their standard review. Uh, they disagree with us, but, but Wagner was abusive discretion. No evidentiary hearing. This case, there was an evidentiary hearing. Judge, uh, O'Hara was standing in shoes of judge Lynch as well as judge. But since that being said, these are two cases that would indicate the abuse of discretion or was the discretion abused, if you will, whether that is the standard review, I would suggest it should be, uh, in Vandenberg one, it was decided. It didn't matter. I don't think it'll matter in this case, but I think the proper standard review, we've all the cases in Illinois, and there's no case for legal services where it was decided that it was anything other than the abuse of discretion standard. Secondly, uh, in respect to the first settlement, uh, that was the, well, first the contract regarding, uh, the case, uh, the maximum contract, uh, called for 40%. If stoopwards filed, uh, we filed a lawsuit. So they claim entitlement to 40% based on our efforts. If the case was so difficult because he is intoxicated, which was barred, they shouldn't have stole the case in the first place. Uh, he didn't know what he was doing. He didn't know how to handle everybody cases. He had to hire all of these legal specialists to teach him. I was brought in the case by Mr. Kralovic because I have tried to have really cases. I know how to get out of federal court. I don't have to short settle a case where the client is going to get in the end from that first settlement, 10.5% of the case, 10.5 client was ultimately going to get 246,000 and change the attorneys out of the first settlement. We're getting 976,000 and change. Uh, and if you think, and he says, oh, they're going to take credit for the deferral. If you look at in, uh, Mr. Scott Vandenberg's first deposition, uh, he produced a draft of the settlement proposal where Scott was going to get 246,000 and some change. Uh, apparently, even though he didn't remember what happened, there must've been a disagreement because when they sent the settlement back, they said, well, we're going to defer 300,000. But, uh, if just to be clear, Mr. McDevoe on seven 29, uh, 13 sent an email to Scott saying, I want to make sure you know that we're going to collect that 300,000 hours at the end of the Brunswick case, no matter what. So that the client was going to get 10.5%. He is a quadriplegic. He is a quadriplegic. And that's what he was going to get out of the case. He barely got as much as the lawyers. He certainly didn't get as much as all the lawyers in the first settlement. And he's the injured party. I think it was, uh, reprehensible and it's a bad mark on our profession. Second, to get to the post-trial, uh, issue in terms of the acceptance, uh, you know, we know what happened. We know that, uh, there was a delay. Now they're trying to make it out as if there wasn't that much of a delay. He got the call from the clerk as he was about to call, uh, Mr. Petitucci. There was no question that Scott Vandenberg first told them they should take the settlement right outside the courtroom at 2.30. Mr. McDevoe said, no, let's wait. We'll go back to the office and discuss it. Then we get a, then the testimony is at 3.40, according to Mr. Vandenberg. He says, take the 25 million. Mr. McDevoe in the evidentiary hearing, he said it was 3.35 to 3.40. Now the briefs try to bring it closer to 3.50, but look at the evidentiary hearing where Mr. McDevoe confirmed that they, that the settlement was accepted at between 3.35 and 3.40 consistent with Scott Vandenberg's testimony. And then there was a delay. Now we get the call from the clerk at 3.52 and we know what happened there. And then he tries to reach out to Mr. Petitucci and Mr. Patton, and then he calls the clerk back at 4.01. Why does he call the clerk back? He hadn't reached him. I think he was doubling back to make sure she hadn't talked to him. Then he finally gets Mr. Petitucci at 4.03. And at that time, after making a counter offer, which Judge O'Hare found to be unethical, as well as the delay to be unethical and violating our rules of professional responsibility, he risked, he risked Mr. Petitucci getting mad and potentially withdrawing the money, contrary to his client's instructions. In any event, they went ahead, they finally settled the case, and we know what happened afterwards. Now, all of this shows, at the end of the day, inequity. They talk about the equity and, you know, their title of quantum merit. Quantum merit is a, is a equitable concept. The person asking for quantum merit needs to show clean hands. This court decided, as every court below decided, that it was Mr. Vandenberg that had clean hands. It was Mr. McTobolo, according to Judge Lynch. It was Mr. McTobolo, according to Judge O'Hare, that decided he did not have clean hands, as we well know. He had dirty hands from the beginning. From the time he took this contract, 40% interest on the expenses. They want to say he risked a million dollars? He didn't risk anything. He was going to get his cost back, win or lose, plus interest on the expenses. He didn't risk a red cent. Look at our contract. If we lose, we eat the expenses. We don't charge interest on expenses. Look at their contract. He didn't risk a penny. Now, when we get to the evidentiary hearing, now we get Mr. Montgomery coming in, and we point out, and I'll rely upon our brief, due to time constraints, the evidentiary hearing, he hires Mr. Montgomery, and now what do we have there? We have the testimony about holding off. They want to say it's triple hearsay. When Mr. Patton said, Judge Baczynski told him that the clerk told her to hold off notifying Mr. Patton. Well, that's not only the testimony of Mr. Patton. That's also the testimony of Ms. Reynolds, the clerk. And it's also the memo of Judge Baczynski that Ms. Agee said, was told, hold off. And why would she hold off telling Mr. Patton there's a note, unless that was part of the conversation? Well, in any event, it was an ex parte communication. It was not divulged to the court. It was hidden from the court. And again, a violation of our law's rules of responsibility. Importantly, when Scott was thinking of getting a new lawyer on January 29, 2016, he asked in an email to Mr. McEvoy, could you give me 30 days? I may need to get a new attorney. Instead of getting him 30 days, they knew that Mr. Montgomery was going to court on February 1st. They set at that time a date for polling of the jury, repolling of this jury. Which they agreed to pay for a juror to come from Arizona. That's outrageous. Why would, I question, why would they ever do that? And then we see the email that says, you know, this Judge Lynch is out to get me. We better give him his repolling. So what happened after that? They don't get the 30-day continuous to get a new lawyer. They let the repolling, unbeknownst to Mr. Vandenberg, he ends up repolling. The judge takes away the settlement, takes away the verdict. And so we have now no offer on the table for Penitucci. He had taken the offer off the table. And at the end of the day, we're brought into the case. Now, in terms of threatening, you're talking about Restatement 37. In terms of threatening, he threatened Scott with an email saying you owe me $900,000 in Mr. Montgomery's fee, plus $200,000, plus $450,000 an hour. So he's invoking the contract, the $450,000 an hour. So you got about one minute to finish up. Okay. So we end up at, he ends up getting fired. And now we're at the firing stage. And we want to talk about Rhodes. Because in their brief, they talk about Rhodes. Well, we'll talk about Rhodes. Rhodes never stood for the proposition that we're no longer looking at cause or no cause firing. In fact, if you look at after Rhodes, you'd have to reverse Lenorius, Gallim, Keck, all those cases that say, if you're fired without cause, and Keck cites Rhodes the same way we rely upon Rhodes, that you need to have clean hands. You have to be fired without cause in order to recover. Quantum heroin requires clean hands. There's no clean hands here. And if you look at the case in Ray Callahan, we didn't accept the Fracasi rule. And Fracasi lawyer was fired without cause. We didn't accept that. We went to the rule where quantum heroin is at the time you're fired. So we went in Ray Callahan. They said, quoting New York, the successor lawyer, the prior lawyer cannot rely upon the successor lawyer. He's entitled to his fees at the time of firing. That's consistent with Mr. McNamara's contract that he's getting $450. But that's if he has clean hands. That's if his conduct was not egregious. And in this case, I rely upon Judge O'Hare's order, which clearly states, and it's, you know, they'd have to say he abused his discretion. If there's one or more of those consistent with the Lioris case, one or more of those rules are violated, he forfeits his fee. His fee is $450. Your time is up. Justice Gordon, did you have any questions? No questions. Justice Cunningham. Justice Cunningham, do you have any questions? I believe she's muted. Oops, I just unmuted. Sorry. No questions. I have one question. What about the costs? Why in the world wouldn't they be entitled to costs? Well, first of all, there's nothing in Mr. McNamara's, I mean, 20-page sworn verification statement, whatever he wants to call it, that says he paid those costs, first of all. So in terms of getting them admitted in the evidence, you have to say I paid. I paid all these costs. I'm out of pocket. Nowhere that I've seen, and I looked over it a few times, and they say I paid. Nowhere does he give the invoices for Judge O'Hare to look at, so he can check whether they're related or not to the case. Where are the invoices? That's what would be required to scrutinize in a case like this, whether one's entitled to compensation. And that didn't happen in this case. He never attested to that. And thirdly, you know, Judge O'Hare did not rule on that. So it's incumbent on the party that's claiming error to get a ruling. And he never got a ruling in this case. He accepted the order, never asked to come back in court and say, Your Honor, you know, you didn't rule on the cost. So they've waived that. It's our position. Lastly, I believe they forfeit in any event because of their misconduct. He shouldn't get anything. He was incompetent. He didn't know how to handle an admiralty case. He hired all these lawyers all this time. I don't know how many depositions they took and how many of these legal specialists took. I really don't. I mean, they have Mike Rasek. The toughest part of a trial is jury instructions. They had him doing the jury instructions. I don't know how much they really did. I don't think they're entitled to any of it. I'm not sure you're responding to my question anymore. Well, I thought I did, Your Honor. Nowhere is it sworn that they said that. That was responsive. Thank you. All right, Mr. Feldman, rebuttal. Thank you. Well, let me just start with the cost. I believe it was sworn. It was a business record that was submitted as part of the petition. The petition for fees was sworn. And Mr. McNamara has submitted an affidavit. And there's really no basis to deny the cost. And there was no objection to the cost in the lower court by the other side. There's a lot that Mr. Power said. Some of it is supported by the record. Much of it is not. Fortunately, everything that he said, we addressed either in our reply or in our motion to strike, which addresses many of the issues that he raised. And I would refer the court to those documents. On the standard of review, this is just like a most cross motions for summary judgment. The review should be de novo. Judge O'Hara had no special insight into the record than this court does. He was the third judge on the case. He didn't try the case. He didn't conduct the evidentiary hearing on which the paper record was submitted. So this is akin to the de novo review that the court would do on cross motions for summary judgment. Mr. Power says that McNamara stole the case. That's simply untrue. It's also irrelevant to the issues. And much of what Mr. Power said was irrelevant. His math on the RQM settlement, about 10.5%, is just wrong. He ignores about $900,000 or $1 million in lien payments that were part of that settlement. Those don't count under his calculus. So his math is just wrong. And that's set forth in our papers. On the issue of delay, the deal got done. It was accepted. Mark McNamara wasn't sitting around twiddling his thumbs or working on the court game, on his golf game. Nobody was sitting and no one was looking at their watches. There's a fact dispute. Was it $340,000? Was it $350,000? And we talk about that in the papers. The reality is Mark said to Scott, come back to the office so we can talk about the most important decision you're going to make in your life about whether to accept this $25 million settlement. That was exactly the right thing to do. You don't make a decision like that in the Daily Center Plaza with Charlie Patitucci sitting at Petarino's across the street. Of course, he's going to talk to his client. He had a duty to talk to his client and was absolutely the right thing to do to talk to his client, make sure they understood the structure of the settlement, make sure they went through the alternative high-low that they were going to reject and take the lump sum instead. And unfortunately, the call came in just as he was about to call Patitucci. There was no sitting around or dithering. And the deal got done. That's the bottom line. The deal got done. And then last point, if I may, that there was no harm. And this really gets back to Justice Gordon's question. There was no harm to the system here. Mark owed a duty to his client, which he fulfilled. He owed no duty to Brunswick. And he did not violate any duty to the system at all. And so I would ask the court to put this case to an end. It's been 10 years since the engagement, five years since the trial. This court has discretion under Rule 366 to enter any order that is just on the record. And we asked that the court award McNaball Law Group the full contingency minus the quantum merit of the lawyers. They're the ones who failed to submit ours when invited to do so. And we had suggested to the trial court that if you very generously give them a blended rate of $500 an hour, 800 hours for doing the post-trial briefing and appearing in this court, that would be a $400,000 deduction that would more than compensate them fairly for their contribution to the successful settlement that Mark McNaball and McNaball Law Group negotiated in a binding settlement after five years of work and a three and a half on June 9th, 2015. We ask for a reversal and entry of an order in that manner. Thank you very much. Thank you. Thank you all. We will take this matter under advisement and this panel of this court is adjourned. Thank you, Your Honor.